**BOATMEN'S FIRST NATIONAL BANK OF KANSAS CITY, Plaintiff,**

v.

**KANSAS PUBLIC EMPLOYEES RETIREMENT SYSTEM, Defendant.**

No. 94–1179–CV–W–1.

United States District Court, W.D. Missouri, Western Division.

Jan. 12, 1996.

Ronald Holt, Bryan, Cave, Kansas City, MO, for plaintiff.

Kenneth P. Ross, Chicago, IL, for defendant.

## ORDER

WHIPPLE, District Judge.

On December 16, 1994, this Court issued a Preliminary Injunction Order, restraining Defendant, the Kansas Public Employees Retirement System ("KPERS"), from filing suit against Plaintiff, Boatmen's First National Bank of Kansas City ("Boatmen's"), in any court other than this one. KPERS appealed that Order, and, in a June 7, 1995 decision, the United States Court of Appeals for the Eighth Circuit directed this Court to enter an order containing detailed findings of fact and conclusions of law concerning the preliminary injunction and the issue of Eleventh Amendment immunity.[1] Accordingly, this Court directed the parties to submit briefs on the issues of injunctive relief and the Court's subject matter jurisdiction. After reviewing the parties' briefs, the Court held an evidentiary hearing on Thursday, September 7, 1995, to provide the parties an opportunity to present all facts relevant to the issue of subject matter jurisdiction and KPERS' potential Eleventh Amendment immunity. The Court has reviewed the record of proceedings upon Boatmen's motion for injunctive relief, the parties' briefs, and the

---

1. *Boatmen's First National Bank of Kansas City v. Kansas Public Employees Retirement System,* 57 F.3d 638, 641 (8th Cir.1995).

proposed findings of fact and conclusions of law on the Eleventh Amendment issue. Based upon the foregoing, the Court hereby makes the following findings of fact and conclusions of law:

## I. SUBJECT MATTER JURISDICTION

### A. Findings of Fact

1. KPERS is based in Topeka, Kansas, and is a "body corporate and an instrumentality of the State of Kansas." K.S.A. § 74-4903. KPERS was established to administer retirement benefits for employees of participating public employers in the State of Kansas. K.S.A. § 74-4901. Boatmen's is a national banking association, having its principal place of business in Kansas City, Missouri.

2. Among other things, KPERS makes various investments with funds contributed by public employers and employees. K.S.A. § 74-4921. The State of Kansas is one of approximately 1,300 employers that actively participate in KPERS. While any governmental entity in the State of Kansas, including counties, cities and school districts, can choose to affiliate with KPERS, some public employers have chosen not to join.

3. The statutory framework indicates that KPERS was established as a self-sustaining entity. K.S.A. § 74-4921(1) provides in relevant part:

> [t]here is hereby created in the state treasury the Kansas public employees retirement fund. All employee and employer contributions shall be deposited in the state treasury to be credited to the Kansas public employees retirement fund. The fund is a trust fund and shall be used solely for the exclusive purpose of providing benefits to members and member beneficiaries and defraying reasonable expenses of administering the fund. Investment income of the fund shall be added or credited to the fund as provided by law. All benefits payable under the system, refund of contributions and overpayments, purchases or investments under the law and expenses in connection with the system unless otherwise provided by

law shall be paid from the fund (emphasis added).

Thus, the State of Kansas maintains KPERS' funds in a trustee capacity for KPERS' members and beneficiaries.

4. KPERS acquires its funding primarily from three sources: employer contributions, employee contributions and investment income. An analysis of KPERS' funding over the 30-year period ending with fiscal year 1991 reveals that 22.4% of KPERS' total revenue was derived from employee contributions, 30.8% was derived from employer contributions, and 46.8% was derived from net investment income. *KPERS' 1991 Annual Report,* at 26. The State of Kansas makes employer contributions on behalf of all state school districts, community colleges and vocational technical schools. As an employer, the State must contribute funds to KPERS calculated in relationship to the number of state employees and the dollar level of their compensation. Between 1985 and 1994, state funds accounted for 64% to 74% of total employer contributions. KPERS estimates that over the next 40 years, state funds will comprise approximately 80% of all employer contributions, with the remaining 20% coming from other government entities.

5. The monies in the KPERS trust fund represent revenues collected from a limited class of persons and employers. These funds are segregated from the general funds of the State of Kansas and are not the product of legislative appropriation. To make a payment from the KPERS trust fund, the Chairperson or Executive Secretary of the KPERS' Board of Trustees must execute a voucher authorizing the Director of Accounts to issue a warrant which is drawn on the state treasury and against the KPERS trust fund. K.S.A. § 74-4921(1). Although these payments are made on state warrants, the money used to fund those payments is taken only from the KPERS trust fund. KPERS can also make payments to other state agencies from which it obtains goods or services by using interfund transfer vouchers.

6. If the KPERS trust fund were to become depleted, due, for instance, to a heavy investment loss or a large adverse judgment,

KPERS' Board could recommend an increase in the rate of employer contributions to make up the shortfall. Such an unfunded liability could also be satisfied at least in part through investment earnings, as KPERS has historically received the greatest portion of its revenue from net investment income. However, the rate of employee contributions could only be increased to fund a corresponding increase in defined benefits.

7. Meredith Williams, the Executive Secretary of KPERS, testified that KPERS has previously paid adverse money judgments with money in the KPERS trust fund. He further stated that KPERS has never requested funds from the State of Kansas to assist KPERS in paying an adverse judgment.

8. The State of Kansas has no legal obligation to pledge the general revenue of the State for the operations of KPERS. Nor is the State subject to any statutory or legal requirement obligating it to assist KPERS in paying adverse judgments. If KPERS were to incur a substantial judgment resulting in an operating shortfall, the State of Kansas could make no payment to KPERS without an act of the Kansas legislature.

9. The State's only obligation to KPERS is that of a participating employer required to make contributions on behalf of its employees. K.S.A. §§ 74–4919, 74–4920c, 74–4939. This obligation is identical to that of the other public employers participating in the KPERS system.

10. A large investment loss by KPERS in any one year will not necessarily require a corresponding increase in recommended employer contributions for the next year because numerous other factors considered in the actuarial calculation, for example, future investment earnings and recoveries from other parties allegedly liable for the loss, may offset the effect of such a loss. KPERS is presently amortizing certain of its investment losses over a forty-year period via a slight increase in employer contribution rates (.383%). However, KPERS has not shown that its alleged $50,000,000 loss in Home Savings debentures, if not recovered from other defendants, will deplete the KPERS trust fund reserves to the extent that an additional increase in employer contributions will be required.

11. One objective of KPERS' investment strategy during the 1980s was to stimulate the Kansas economy. However, this goal was secondary to KPERS' primary purpose of investing its assets to preserve the value of the KPERS trust fund so as to provide adequate retirement benefits for participating public employees.

12. By statute, KPERS is a distinct legal entity that can sue and be sued in its official name. K.S.A. § 74–4904. It has also been granted certain powers to carry out its purpose, including a limited power to contract with the State and third parties. K.S.A. §§ 74–4909, 4903. KPERS' staff, with input from its Board, decides whether to file and when to settle lawsuits.

13. Benefits paid by KPERS and property owned by KPERS are immune from state taxation. K.S.A. § 74–4923(b).

14. KPERS is governed by a nine-member Board of Trustees that is responsible for the general administration of the system. K.S.A. §§ 74–4905(a), 74–4909(1). Four Board members are appointed by the Governor, one is appointed by the President of the Senate, one is appointed by the Speaker of the House, two are elected by KPERS' members and retirees, and the final member is the State Treasurer. K.S.A. § 74–4905(a). Actions taken by the Board require a favorable vote of at least five Board members. K.S.A. § 74–4906(2). Prior to July 1, 1993, KPERS' Board was comprised of seven members—all appointed by the Governor. In addition, all KPERS Board meetings are open to the public. K.S.A. § 74–4909(4).

15. As a statutorily created entity, KPERS must abide by many requirements set by the Kansas legislature. For example, KPERS' Board must annually present a report to the Governor and other State officials detailing its operations, income, disbursements, financial condition, and investments. K.S.A. §§ 74–4907(2), 74–4921(11). The Legislative Post–Audit Committee conducts an annual audit of KPERS' accounts and the Legislative Post–Auditor conducts an annual financial-compliance audit of KPERS' invest-

ments. K.S.A. §§ 74–4907a(3), 74–4921(12)(a). In addition, KPERS' employees are subject to Kansas state employee travel restrictions and ethical rules and the Kansas Civil Service Act. K.S.A. § 74–4908(2). KPERS' principal office must be in Topeka; its offices are assigned by the Kansas Secretary of Administration. K.S.A. § 74–4907a(1). Furthermore, KPERS does not have unilateral authority to make purchases over a set dollar level or to make certain personnel decisions.

16. Despite the statutory requirements imposed by the State, KPERS' day-to-day operations are carried out under the direction of an Executive Secretary, who is appointed by the Board and who, in turn, appoints an administrative staff. K.S.A. § 74–4909. Neither the Governor nor any other State official has veto power over the decisions of the KPERS' Board.

17. A Kansas state statute purports to allow KPERS to be sued only in Shawnee County, Kansas. K.S.A. § 74–4904a. Upon the request of KPERS' Board, the Kansas Attorney General will furnish all necessary legal services to KPERS. § 74–4908(4).

18. During the years 1986–1987, K.D.F., a Kansas nominee general partnership ("KDF"), allegedly acting on behalf of KPERS, made investments in the Home Savings Association of Kansas City, F.A. ("Home Savings") totalling $65,000,000. Home Savings was a Missouri-based federally chartered capital stock savings and loan association, having its principal place of business in Kansas City, Missouri. Two of the investments KDF purchased from Home Savings were subordinated debentures totalling $50,-000,000.

19. Boatmen's agreed to serve as the indenture trustee for the Home Savings debentures and entered into certain primary and supplemental indenture agreements. Among other things, each of these indenture agreements states that "[w]henever this Indenture refers to a provision of the TIA [the federal Trust Indenture Act of 1939], the provision is incorporated by reference in and made a part of this Indenture, notwithstanding the fact that at the time of its execution, the Indenture is not qualified under the TIA." *Plain-*

*tiff's exhibits A & C,* § 1.3. In addition, each of the indenture agreements states that "[a]ny provision of this Indenture which would be required to be contained herein if the Indenture were qualified under the TIA shall be construed and interpreted in accordance with interpretations of the TIA by courts and the Securities and Exchange Commission." *Plaintiff's exhibits A & C,* § 12.1. Boatmen's acted as indenture trustee for the Home Savings debentures until approximately April of 1990, when KDF exchanged the debentures for a newly created class of Home Savings preferred stock.

20. In March of 1991, Home Savings was placed in receivership by the Resolution Trust Corporation ("RTC"). There were few assets available for distribution to creditors and equity participants, and KPERS now contends that it has lost the entire amount of its $50,000,000 investment in Home Savings debentures.

### B. Conclusions of Law

Before considering whether injunctive relief is warranted, the Court must first ensure that it has proper jurisdiction over this action. It is undisputed that the parties are subject to the personal jurisdiction of this Court. Unfortunately, the issue of subject matter jurisdiction is not as clear.

#### 1. Federal Question Jurisdiction

Boatmen's asserts that this Court has federal question jurisdiction over this action, pursuant to 28 U.S.C. § 1331, because its declaratory judgment claims arise under the provisions of a federal statute, the Trust Indenture Act of 1939 ("TIA"), 15 U.S.C. §§ 77aaa–77bbbb. While Boatmen's did serve as the indenture trustee for the Home Savings debentures, each indenture expressly states that at the time of its execution it was not qualified under the TIA. Furthermore, section 77ddd(a)(4)(A) of the TIA provides that: "[t]he provisions of this subchapter shall not apply to any of the following securities: .... (4)(A) any security exempted from the provisions of the Securities Act of 1933, by paragraphs (2) to (8), or (11) of subsection 3(a) thereof ..." 15 U.S.C. § 77ddd(a)(4)(A). Subsection 3(a)(5) of the Securities Act of 1933 exempts "[a]ny securi-

ty issued (A) by a savings and loan association ... or similar institution, which is supervised and examined by State or Federal authority having supervision over any such institution...." 15 U.S.C. § 77c(a)(5). Because the debentures were issued by a savings and loan association, Home Savings, they are exempt from the TIA.

Boatmen's relies on *Harmsen v. Smith,* 693 F.2d 932, 940 (9th Cir.1982), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983), and *Weaver v. Marine Bank,* 637 F.2d 157, 164 (3d Cir.1980), *rev'd on other grounds,* 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982), for the proposition that the savings and loan exemption of 15 U.S.C. § 77ddd(a)(4)(A) applies only to the registration provisions and not the disclosure provisions of the federal securities laws and the TIA. However, these cases are inapposite because they simply recognize that securities that are exempt from the Securities Act of 1933 are not thereby exempt from the antifraud provisions of the Securities Exchange Act of 1934. 15 U.S.C. §§ 78a. Moreover, neither of these cases even addresses the exemption provisions of the TIA. Consequently, the Court finds that it lacks federal question jurisdiction over this action.

### 2. Diversity Jurisdiction and Eleventh Amendment Immunity

■ Boatmen's next asserts that this Court has diversity of citizenship jurisdiction over this action, pursuant to 28 U.S.C. § 1332. Absent an express waiver of immunity, the Eleventh Amendment bars federal courts from hearing "any suit in law or equity commenced or prosecuted against one of the United States by Citizens of another State...." U.S. Const. amend. XI. While the Eleventh Amendment protects states from being sued in federal court, it does not always protect state-connected entities. *Sherman v. Curators of the University of Missouri,* 16 F.3d 860, 862 (8th Cir.1994). Therefore, the threshold question in this action is whether KPERS is an alter ego of the State of Kansas and can thereby avail itself of the protections of the Eleventh Amendment. Because issues of Eleventh Amendment immunity are not affected by the nature of the relief sought, it is irrelevant that

Boatmen's seeks declaratory relief in this action rather than money damages. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984).

In determining whether an agency is the alter ego of a state, federal courts have identified various factors to consider. Among the most common considerations are the following:

1) whether payment of a judgment against the agency will affect the state treasury; 2) local law and decisions defining the status of the agency; 3) whether the agency has the funds or the power to satisfy a judgment; 4) whether the agency is performing a governmental or proprietary function; and 5) the agency's degree of autonomy over its operations.

*See, e.g., Bolden v. Southeastern Pennsylvania Transp. Auth.,* 953 F.2d 807, 819 (3d Cir.1991), *cert. denied,* 504 U.S. 943, 112 S.Ct. 2281, 119 L.Ed.2d 206 (1992); *Ram Ditta v. Maryland Nat'l Capital Park & Planning Comm'n,* 822 F.2d 456, 457–58 (4th Cir.1987); *Kovats v. Rutgers, The State Univ.,* 822 F.2d 1303 (3d Cir.1987), *cert. denied,* 489 U.S. 1014, 109 S.Ct. 1126, 103 L.Ed.2d 188 (1989). The Court will evaluate each of these factors.

#### a. Judgment impact on state treasury

In its recent decision in *Hess v. Port Authority Trans–Hudson Corp.,* 513 U.S. ——, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994), the Supreme Court noted that the most important consideration in determining whether a state-created entity qualifies for Eleventh Amendment immunity is whether a judgment against the entity must be satisfied by the State. *Id.* at ——, 115 S.Ct. at 404, 130 L.Ed.2d at 260. The Court held that the mere possibility a State might have to satisfy a judgment rendered against the entity in question is insufficient to give rise to immunity. *Id.* at ——, 115 S.Ct. at 406, 130 L.Ed.2d at 262. In elaborating on the distinction between the possibility of payment from a state treasury and a firm obligation to pay, the Court explained:

[t]he proper focus is not on the use of profits or surplus, but rather is on losses

and debts. If the expenditures of the enterprise exceed receipts, is the State in fact obligated to bear and pay the resulting indebtedness of the enterprise? When the answer is "No"—both legally and practically—then the Eleventh Amendment's core concern is not implicated.

*Id.*

The specific question in *Hess* was whether a port authority created pursuant to a bistate compact is entitled to Eleventh Amendment immunity. The *Hess* Court ultimately determined that the port authority is not entitled to immunity because it is financially independent and requiring it to answer an action for damages in federal court would not affect the states' solvency or sovereignty. *Id.* at ——, 115 S.Ct. at 407, 130 L.Ed.2d at 263. In a similar case, *Port Authority Police Benevolent Assn., Inc. v. Port Authority of New York and New Jersey ("Port Authority PBA")*, 819 F.2d 413, 416 (3d Cir.), *cert. denied*, 484 U.S. 953, 108 S.Ct. 344, 98 L.Ed.2d 370 (1987), the Third Circuit had assumed that if a similar port authority was ever in need the states would make up the shortfall. However, the *Hess* Court condemned this approach, finding that nothing in the interstate compact at issue in *Port Authority PBA* or the laws of either affected state supported such a charitable assumption. *Hess*, 513 U.S. at ——, 115 S.Ct. at 403, 130 L.Ed.2d at 259. *See also Bowen v. Hackett*, 387 F.Supp. 1212, 1221 (D.R.I.1975) (fact that Rhode Island may feel morally obligated to replenish the state's employment security fund in time of emergency is of no consequence because such "a possible ancillary effect on the state's general treasury is simply too attenuated to bring the Eleventh Amendment into play.").

At present, no Kansas law obligates or authorizes the State of Kansas to satisfy any judgment entered against KPERS or remedy any deficit incurred by KPERS. Pursuant to the laws of Kansas, if KPERS were to suffer a judgment resulting in an operating shortfall, Kansas could make no payment to KPERS without a specific act passed by the Kansas legislature. The State's only obligation to KPERS is that of a participating employer required to make contributions on behalf of its employees. While the State of Kansas does provide a significant percentage of KPERS' total employer contributions, the existence of significant state financial support for a state-connected entity is not dispositive. *See Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977); *Blake v. Kline*, 612 F.2d 718, 724 (3d Cir.1979), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1112 (1980). Instead, "a court should consider whether the state, in making the contribution, is acting in the role of the sovereign or is contributing in some other capacity." *Blake*, 612 F.2d at 724. Because the State of Kansas, as a sovereign, makes no general appropriations to KPERS, the Court finds that it acts only as an employer when it makes employer contributions to KPERS.[2]

Although no statute or judicial ruling requires the State of Kansas to answer for KPERS' judgments, KPERS claims that its employer contributions sufficiently impact the state treasury so as to warrant Eleventh Amendment protection. Thus, the question becomes whether Kansas' duty to make employer contributions to KPERS can be viewed as a legal obligation to help satisfy a judgment rendered against KPERS. The answer depends on the size of the judgment. A small or moderate judgment against KPERS, such as a judgment for disputed benefits, could easily be satisfied out of KPERS' reserves. As a practical matter, KPERS has historically used monies from its own trust fund to satisfy such judgments. In addition, the State of Kansas has never appropriated funds to assist KPERS in paying a judgment. However, to show a greater connection to the state treasury, KPERS relies on a more attenuated scenario—the theoretical possibility that someday KPERS will incur an enormous judgment that will require it to increase the rate of employer

---

**2.** KPERS asserts that the present case is distinguishable from *Hess* because the states in *Hess* did not appropriate funds to the disputed agency. However, this argument is unavailing because the State of Kansas makes no separate appropriations to KPERS and only contributes to KPERS as a participating employer.

contributions to make up the shortfall. KPERS asserts that this hypothetical and roundabout connection to the Kansas state treasury is sufficient to satisfy the *Hess* standard. The Court disagrees. The mere possibility of having to pay for a judgment is simply not good enough.

In summary, the Court finds that the State of Kansas is not legally or practically liable for payment of any judgments rendered against KPERS. While the State of Kansas does make contributions to KPERS as a participating employer, this relationship does not create an obligation to satisfy adverse judgments. Consequently, this critical factor weighs against finding that KPERS is entitled to Eleventh Amendment immunity.

### b. Other factors

While the impact on a State's treasury is the single most important element to consider in evaluating questions of Eleventh Amendment immunity, the Court must also evaluate other factors.

### i. Local law and decisions

The Court must next consider local law and decisions defining the status and nature of KPERS in its relation to the State of Kansas. The Court is cognizant of other decisions finding that KPERS is an alter ego of the State of Kansas for purposes of the Eleventh Amendment. *See, e.g., American International Specialty Lines Insurance Co. v. Reimer & Koger Associates, Inc.,* 874 F.Supp. 324, 326 (D.Kan.1995); *Reiger v. KPERS,* 755 F.Supp. 360, 361 (D.Kan.1990); *K.D.F. v. Rex,* 878 S.W.2d 589, 596 (Tex. 1994); *Shapiro v. KPERS,* 216 Kan. 353, 532 P.2d 1081, 1083 (1975). However, the Court does not find any of these cases to be persuasive because none contains an analysis of the state treasury issue as required by the *Hess* Court. Furthermore, KPERS' citation to various state decisions finding that other state retirement systems are immune from suit under the Eleventh Amendment is of little value, as each entity must be considered on the basis of its own particular circumstances. *Sherman,* 16 F.3d at 863. More importantly, most of the state decisions cited by KPERS provide little or no analysis of the Eleventh Amendment issue.

### ii. Funds to satisfy adverse judgments

The Court will next consider whether KPERS generally has the funds to satisfy adverse judgments. Mr. Williams, the Executive Secretary of KPERS, testified that KPERS has previously paid money judgments rendered against it using funds from the KPERS trust account. Also, KPERS has never sought funds from the State of Kansas to assist in paying an adverse judgment. Notably, the KPERS trust fund contains approximately six billion dollars. Such an amount appears sufficient to absorb the cost of all but the most exorbitant of potential adverse judgments.

### iii. Governmental vs. proprietary function

Next, the Court must consider whether KPERS is performing a governmental or proprietary function. The distinction between these functions has been described as follows:

> [g]overnmental functions are those which are performed for the general public with respect to the common welfare and for which no compensation or particular benefit is received, while proprietary functions are exercised when an enterprise is commercial in character or is usually carried on by private individuals or is for the profit, benefit or advantage of the governmental unit conducting the activity.

*State v. Graham,* 12 Kan.App.2d 803, 758 P.2d 247, 251 (1988) (citation omitted). KPERS serves a function similar to a retirement system operating in the private sector. It routinely makes investments that are commercial in nature and it exists for the benefit of its participants. When the State of Kansas makes employer contributions to KPERS it purchases benefits for state employees similar to a private employer purchasing benefits from a private pension plan. Unlike providing public education or maintaining roads and bridges, the provision of retirement benefits is not a role traditionally undertaken by the state. Furthermore, the Kansas Supreme Court has noted that KPERS performs a function "ordinarily reserved to the field of private enterprise." *Shapiro v. KPERS,* 216 Kan. 353, 532 P.2d 1081, 1084 (1975). *See also Matter of Mid-*

*land Industries, Inc.*, 237 Kan. 867, 703 P.2d 840, 843 (1985) (finding KPERS' function to be proprietary in nature).

KPERS argues that it performs a government function because its investments are an attempt to stimulate and develop the Kansas economy. However, stimulating the economy is clearly secondary to KPERS' primary purpose of investing its assets to preserve the value of the KPERS trust fund so as to provide adequate retirement benefits for public employees—a proprietary function. When KPERS makes investments, no matter what the motive, it is investing money in a manner no different from a private entity.

In arguing that KPERS fulfills a governmental function, KPERS also relies on the language in its enabling statute, K.S.A. § 74–4901, which states that part of KPERS' purpose is "effecting economy and efficiency in the administration of governmental affairs." However, reading this statute in context suggests that the administration of governmental affairs is secondary to the provision of retirement benefits to participating employees. Consequently, the Court finds that KPERS performs a proprietary rather than a governmental function.

### iv. Autonomy

Finally, the Court must consider whether KPERS is an autonomous enterprise. Overall, KPERS appears to be a self-sustaining entity. It acquires its funding exclusively from employer and employee contributions and investment income, and all benefits and expenses payable under the system are paid from the KPERS trust fund. In addition, KPERS has the power to sue and be sued [3] in its own name and a limited power to enter into contracts. K.S.A. §§ 74–4904, 4909, 4903; *see also Shapiro*, 532 P.2d at 1083. While KPERS has not been separately incorporated, it is a body corporate and functions as a "distinct legal entity" governed by an independent Board of Trustees. *Shapiro*, 532 P.2d at 1083.

---

**3.** KPERS argues that the State of Kansas allows KPERS to be sued only in Shawnee County, Kansas. K.S.A. § 74–4904a. However, this state venue provision does not control here. "The laws of a state cannot enlarge or restrict

Furthermore, neither the Governor nor any other State official has veto power over the decisions of the KPERS' Board. In contrast, the port authority held not to have immunity in *Hess* was subject to the veto power of each states' governor and the state legislatures had the power to control the authority's projects. *Hess* at 513 U.S. at ——, 115 S.Ct. at 404, 130 L.Ed.2d at 260. In addition, KPERS' day-to-day operations are carried out under the direction of an Executive Secretary who is appointed by the Board and KPERS' staff members decide whether to file and when to settle lawsuits. Therefore, from a practical standpoint, the State of Kansas has immunized itself from responsibility for KPERS operations.

However, KPERS is subject to numerous state controls. Among other things, the Kansas legislature requires KPERS to: annually present a detailed operations report to the Governor and other State officials; allow the Legislative Post–Auditor to conduct an annual audit of its accounts; maintain its principal office in Topeka; use the Kansas Attorney General for all necessary legal services; subject its employees to Kansas state employee travel restrictions, ethical rules and the Kansas Civil Service Act; secure state approval before making purchases over a set dollar level or making certain personnel decisions. Also, the benefits paid by KPERS and property owned by KPERS are immune from state taxation. In addition, seven of the nine KPERS' Board members are appointed by Kansas State officials. But control is not dispositive because gauging actual control can be an uncertain and unreliable exercise. *Hess*, at ——, 115 S.Ct. at 404, 130 L.Ed.2d at 260. "Ultimate control of every state-created entity resides with the State, for the State may destroy or reshape any unit it creates. Political subdivisions exist solely at the whim and behest of their State, yet cities and counties do not enjoy Eleventh Amendment immunity." *Id.*

Due primarily to the statutory requirements imposed on KPERS by the State, the

---

the jurisdiction of the federal courts.... [and] a state venue statute can have no application to the courts of the United States." *Markham v. City of Newport News*, 292 F.2d 711, 716 (4th Cir.1961) (citations omitted).

## 140

Court finds that considerations of autonomy weigh slightly in favor of finding that KPERS is not autonomous.

### c. Summary of all relevant factors

While the state treasury analysis—the most critical element to consider in evaluating Eleventh Amendment immunity—points in favor of denying immunity for KPERS, the other factors give differing indications of immunity. The Eighth Circuit has stated that the impact on a State's treasury is dispositive when it is questionable whether a particular entity receives Eleventh Amendment protection. *Thomas v. FAG Bearings Corp.*, 50 F.3d 502, 506 n. 11 (8th Cir.1995). Accordingly, the Court holds that KPERS is not an alter ego of the State of Kansas and is not entitled to Eleventh Amendment immunity. Consequently, the Court has jurisdiction over this action pursuant to the diversity of citizenship provision of 28 U.S.C. § 1332.

## II. INJUNCTIVE RELIEF

### A. Findings of Fact

1. In June of 1991, KPERS filed suit in the Shawnee County, Kansas District Court against several investment advisors, law firms and accountants, seeking to recover its $65,000,000 investment in Home Savings, including the $50,000,000 in debentures (the "Home Savings Case"). The former directors and officers of Home Savings (the "Home Savings Defendants") were added to the suit later in 1991. After the Homes Savings Defendants filed a third-party complaint against the RTC in the fall of 1992, the RTC exercised its power under 12 U.S.C. § 1441a to remove the Home Savings Case to this federal district court. That case remains pending before Judge D. Brook Bartlett of this Court.[4]

2. In late 1994, KPERS decided to add two Kansas City law firms (Blackwell, Sanders, Matheny, Weary & Lombardi and Shook, Hardy & Bacon) and Boatmen's to the list of parties from whom it is seeking to recover its alleged Home Savings losses. These parties were advised by KPERS that it intended to bring suit against them in the Shawnee County, Kansas District Court. On October 18, 1994, KPERS' counsel telephoned Boatmen's general counsel and stated that KPERS believed it had valid claims against Boatmen's. Later that day, KPERS' counsel faxed a letter to Boatmen's offering to discuss settlement before filing a complaint. KPERS' counsel enclosed a draft complaint with the letter and stated that KPERS would file the suit if Boatmen's did not respond by October 30, 1994.

3. On October 21, 1994, three days after receiving notice of KPERS' intent to sue, Boatmen's filed an application to intervene as a party defendant in the Home Savings case pending before Judge Bartlett. The two law firms received earlier notification from KPERS and filed similar intervention applications prior to Boatmen's.

4. Along with its application to intervene, Boatmen's filed a motion for injunctive relief seeking to prohibit KPERS from suing Boatmen's in Kansas state court. Pending the resolution of its application to intervene, KPERS agreed not to institute a separate action against Boatmen's.

5. On October 26, 1994, Judge Bartlett issued an Order recusing himself, pursuant to 28 U.S.C. § 455(b), from any involvement in Boatmen's application to intervene because he owns stock in Boatmen's parent company. Judge Bartlett's October 26, 1994 Order assigned Boatmen's intervention application to this division.

6. On December 12, 1994, while its intervention application was still pending, Boatmen's filed a separate declaratory judgment action against KPERS in this federal district court. That action was ultimately assigned to this division. Contemporaneous with its filing of the declaratory judgment action, Boatmen's also filed a motion in the Home Savings Case seeking a stay of proceedings on its application to intervene pending the resolution of its newly filed declaratory judgment action. The motion to stay was subsequently granted.

---

4. *Kansas Public Employees Retirement System v. Reimer & Koger Assoc., Inc.,* Case No. 92-0922- CV-W-9.

7. Boatmen's lawsuit seeks a judgment declaring that it has no liability for any part of KPERS' alleged $50,000,000 loss from the Home Savings debentures. Boatmen's asserts that the terms of the Home Savings indenture agreements did not impose on Boatmen's any of the duties alleged by KPERS in its draft petition. Boatmen's also claims that KDF effectively released and discharged Boatmen's of any duties it may have had as indenture trustee when KDF exchanged the subordinated debentures for Home Savings preferred stock. Boatmen's complaint does not refer to any particular statute of limitations that might be applicable to KPERS' claims.

8. In addition to seeking substantive declaratory relief, Boatmen's declaratory judgment action seeks injunctive relief to prevent KPERS from proceeding with its previously announced plan to file a separate suit against Boatmen's in Kansas state court. Along with its complaint, Boatmen's filed a motion for a temporary restraining order and preliminary injunction to prevent any such duplicative litigation.

9. On December 16, 1994, this Court conducted a hearing on Boatmen's motion for injunctive relief. That same day, the Court entered a preliminary injunction restraining KPERS from filing duplicative litigation against Boatmen's. KPERS appealed that ruling to the Eighth Circuit, contending that the preliminary injunction was entered without the requisite findings of fact and conclusions of law and arguing, for the first time on appeal, that the Eleventh Amendment divests this Court of subject matter jurisdiction over the underlying case.

10. A special ten-year statute of limitations passed by the Kansas Legislature may apply to KPERS' claims in this action.

### B. Conclusions of Law

Boatmen's has filed a motion for injunctive relief seeking to prevent KPERS from proceeding with a similar lawsuit against Boatmen's in Kansas state court. Boatmen's argues that KPERS should be enjoined from filing a Kansas suit because such an action would be duplicative, a waste of judicial resources, and likely to lead to inconsistent judicial rulings. To the contrary, KPERS contends that as the "natural" plaintiff it should be allowed to pursue its choice of forum and that Boatmen's preemptory filing has precluded such a choice.

It is undisputed that the present declaratory judgment action and KPERS' contemplated Kansas suit (as evidenced by its draft complaint) embrace the same subject matter—Boatmen's role in KPERS' investments in the Home Savings debentures. When confronted with potentially duplicative litigation, the Eighth Circuit requires that courts follow the first-filed rule. This rule "gives priority, for the purposes of choosing among possible venues when parallel litigation has been instituted in separate courts, to the party who first establishes jurisdiction." *Northwest Airlines, Inc. v. American Airlines, Inc.*, 989 F.2d 1002, 1006 (8th Cir.1993). The governing standards for the first-filed rule were set forth by the Eighth Circuit in *United States Fire Ins. Co. v. Goodyear Tire & Rubber Co.*, 920 F.2d 487, 489 (8th Cir.1990):

> [t]he well-established rule is that in cases of concurrent jurisdiction, the first court in which jurisdiction attaches has priority to consider the case. This first-filed rule is not intended to be rigid, mechanical, or inflexible, but is to be applied in a manner best serving the interests of justice. The prevailing standard is that in the absence of compelling circumstances, the first-filed rule should apply.

*Id.* (citations omitted). Hence, the first-filed rule is the default rule and will apply unless compelling circumstances support its abrogation. *Northwest*, 989 F.2d at 1006.

■ While KPERS has threatened to file suit against Boatmen's in Kansas, it has not yet done so. Thus, there is no question that the present action, filed by Boatmen's, is the "first-filed" suit. Therefore, to avoid the first-filed rule, KPERS must show that compelling circumstances are present. A party may demonstrate compelling circumstances by showing, *inter alia*, that the first action was filed in bad faith or that the plaintiff in the first-filed action raced to the courthouse to avoid litigating in another forum. *Northwest Airlines, Inc. v. American Airlines, Inc.*, 792 F.Supp. 655, 658 (D.Minn.1992),

*aff'd*, 989 F.2d 1002 (8th Cir.1993) (citations omitted). However, in determining whether to enjoin a party from proceeding with a later-filed action in another forum, a court should also consider "[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." [5] *Northwest Airlines*, 792 F.Supp. at 658 (quoting *Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.*, 342 U.S. 180, 183, 72 S.Ct. 219, 221, 96 L.Ed. 200 (1952)).

It is useful to begin this analysis by examining the facts of the *Northwest* case. In *Northwest*, the general counsel of American Airlines wrote to her counterpart at Northwest Airlines complaining that Northwest's recent hiring of nine American employees was wrongful and that a recent Texas decision would give American "a decent chance of prevailing against Northwest **should we elect to sue.**" *Northwest*, 989 F.2d at 1003 (emphasis in original). Six weeks after responding to American's letter, Northwest filed an action in the District of Minnesota seeking a declaratory judgment that it had lawfully hired and could continue to hire American's at-will employees. Six weeks later, American countered with its own action against Northwest in the Northern District of Texas alleging tortious interference and seeking an injunction. The Minnesota district court enjoined American from proceeding in Texas, finding a lack of compelling circumstances to invalidate the first-filed rule because Northwest had not acted in bad faith or raced to the courthouse. *Id.* at 1004.

On appeal, the Eighth Circuit affirmed the grant of the preliminary injunction but took note of two "red flags" that suggested compelling circumstances might exist. First, the court was troubled by the fact that "Northwest was on notice that American was at least considering filing suit against Northwest." *Id.* at 1007. However, the fact that American's letter "gave no indication that a lawsuit was imminent, or that American was doing anything more than blowing smoke about a potential lawsuit" suggested that American's second-filed suit was not truly contemplated until after Northwest had filed its action. *Id.* Second, the court noted "the fact that Northwest's action was for declaratory judgment also merits a closer look, as such an action may be more indicative of a preemptive strike than a suit for damages or equitable relief." *Id.* However, the Eighth Circuit found that Northwest's declaratory judgment action had been motivated by the fact that its hiring was being chilled by American's suggestion that Northwest's hiring practices were illegal, rather than an attempt to beat American to the courthouse. While ultimately upholding the injunction, the Eighth Circuit noted that these two factors made the case a "close call." *Id.*

At the outset, *Northwest* is distinguishable from the present action in one major respect: a second suit has not actually been filed. However, the Court finds that this fact is not significant because KPERS has never had a chance to file a second suit. Immediately after Boatmen's moved to intervene in the Home Savings case, KPERS agreed with Boatmen's that it would not institute a separate action pending resolution of the application to intervene. Then, while the motion to intervene was still pending, this Court enjoined KPERS from filing its contemplated second suit. It appears that KPERS had every intention of filing its Kansas suit but was prevented from doing so. Therefore, the fact that a second suit has not actually been filed is unimportant and *Northwest* should control.

## 1. Red flags

Notably, the two "red flags" the *Northwest* court found disturbing are also present here. First, Boatmen's clearly knew that KPERS was prepared to sue. KPERS' letter to Boatmen's was accompanied by a draft com-

---

5. At the December 16, 1994 injunction hearing, both the Court and the parties erroneously assumed that the *Dataphase* standards for injunctive relief were applicable. *See Dataphase Systems, Inc. v. C.L. Systems, Inc.*, 640 F.2d 109, 114 (8th Cir.1981) (*en banc*). However, an injunction to restrain a party from proceeding with a second suit in another forum is not subject to the *Dataphase* standards for injunctive relief because "the question has nothing to do with the merits of the underlying controversy and is simply whether ... the court in which jurisdiction first attached should proceed to adjudicate the controversy and should restrain the parties from proceeding with the later-filed action." *Northwest*, 989 F.2d at 1004.

plaint and affirmatively stated that the complaint would be filed if Boatmen's did not respond by October 30. The fact that KPERS' suit was imminent when this action was filed suggests that Boatmen's present lawsuit was motivated by the prospect of KPERS' suit and was not independently contemplated by Boatmen's.[6] Boatmen's counters by pointing out that this action was not filed until some eight weeks after KPERS had given notice of its intention to sue, by which time its intervention effort looked doubtful due to the unforeseen problem of Judge Bartlett's recusal. However, only three days after KPERS' gave its notice, Boatmen's filed, along with its application to intervene, a motion for injunctive relief seeking to prohibit KPERS from filing suit against Boatmen's in Kansas. Hence, Boatmen's immediate reaction to KPERS' notice of suit was, in part, to seek to prevent KPERS from suing in its chosen forum. Furthermore, KPERS' agreement not to sue pending resolution of Boatmen's application to intervene provided Boatmen's with its eight weeks of breathing room.

Second, like the plaintiff in *Northwest,* Boatmen's is seeking declaratory relief. This may indicate a preemptive strike. Unlike in *Northwest,* where the plaintiff was motivated to seek a declaratory judgment due to an adverse effect on its hiring program, there is no evidence that KPERS' threat of suit affected Boatmen's business in any way. Rather, Boatmen's asserts that its objective in filing this declaratory judgment action was to coordinate this case with the ongoing proceedings in the Home Savings Case before Judge Bartlett and thereby avoid duplication of efforts and inconsistent rulings. However, this goal of judicial efficiency pales when contrasted with the economic harm facing the plaintiff in *Northwest.*

Moreover, it is questionable whether it was possible, at the time this action was filed, to realize any judicial efficiencies via coordination with the Home Savings Case. Boatmen's counsel stated at the December 16, 1994 hearing that the issue of Boatmen's liability "can be resolved [in this Court] in a much quicker, more efficient manner without becoming bogged down in all of the issues that are pending across the hall [before Judge Bartlett]." *Transcript of Proceedings,* at 3. Thus, Boatmen's has acknowledged that there is no real judicial economy to be achieved by coordinating this action with the Home Savings Case. The parties' ability to monitor the progress of the Home Savings Case will not be affected whether they proceed in this Court or in Kansas state court.

In its recent decision in *BASF Corp. v. Symington,* 50 F.3d 555 (8th Cir.1995), the Eighth Circuit noted that "[d]eclaratory judgment actions may on occasion merit 'a closer look' to ensure that the declaratory plaintiff is not motivated by forum-shopping concerns." *Id.* at 558. A critical question of law in the *BASF* case centered on ascertaining the applicable statute of limitations. In *BASF,* the court found that a second-filed declaratory judgment action, filed in North Dakota, was "chiefly calculated" to take advantage of a favorable statute of limitations, and that such an action could possibly preclude a previously filed personal injury suit in New Jersey, where a longer statute of limitations would apply. *Id.* at 559. In ordering the second suit dismissed, the court expressed its concern that granting the requested declaratory relief could effectively deny the allegedly injured party its legitimate choice of forum and time for suit. *Id.*

While the procedural posture is slightly different, this case bears some resemblance to *BASF.* KPERS' counsel acknowledged, at the December 16, 1994 hearing, that one of the reasons it wants this controversy to be heard in a Kansas state court is its concern that it otherwise might lose the application of

---

6. Boatmen's acknowledges in its complaint that this action was filed in anticipation of KPERS' threatened claims:

> [t]o avoid the difficulties and uncertainties surrounding intervention, Boatmen's has filed this action **to secure an adjudication of KPERS' threatened claims,** and of Boatmen's rights

and obligations under the Indenture Agreements ... in another division of this Court where proceedings on these claims can better be coordinated with proceedings in the Home Savings Case."

Boatmen's Complaint, at 6 (emphasis added).

a special ten-year statute of limitations.[7] The applicable Missouri limitations statute is significantly shorter. KPERS contends that the law of the state that a plaintiff chooses as its forum determines the applicable statute of limitations. Thus, KPERS argues that if the first-filed rule is applied in this case, it may be deprived of a critical benefit of its choice of forum—a favorable statute of limitations. Boatmen's contends that the issue of which statute of limitations should be applied has yet to be raised, and, depending on the outcome of Boatmen's request for declaratory relief, the issue conceivably might not be reached by this Court.

Depending, in part, on whether choice-of-law rules are employed and depending on which state's laws are applied, the special Kansas ten-year statute of limitations may or may not apply to KPERS' claims. Additionally, it is unclear whether this statute will pass constitutional muster. Nonetheless, the statute of limitations issue may ultimately affect the outcome of this case, and both sides were well aware of this fact when the instant action was filed. This point must be considered when evaluating whether Boatmen's motive in filing this action was anticipatory. Overall, when the attendant circumstances are considered, the declaratory judgment red flag indicates a preemptive strike by Boatmen's.

### 2. Other considerations

#### a. Encouraging settlement

If KPERS had not notified Boatmen's of its intent to sue and offered to discuss settlement before filing a complaint, it is questionable whether Boatmen's would have sought to intervene in the Home Savings case, or filed the present declaratory judgment action. "Potential plaintiffs should be encouraged to attempt settlement discussions (in good faith and with dispatch) prior to filing lawsuits without fear that the defendant will be permitted to take advantage of the opportunity to institute litigation in a district of its own choosing before plaintiff files an already drafted complaint." *Columbia Pictures In-*

*dus., Inc. v. Schneider,* 435 F.Supp. 742, 747–48 (S.D.N.Y.1977), *aff'd,* 573 F.2d 1288 (2d Cir.1978). Moreover, the application of the first-filed rule should not penalize parties for their efforts to settle matters out of court. *Johnson Bros. Corp. v. Int'l Brotherhood of Painters,* 861 F.Supp. 28, 29–30 (M.D.La. 1994). *Accord, 909 Corporation v. Bolingbrook Police Pension Fund,* 741 F.Supp. 1290, 1293 (S.D.Tex.1990); *Merle Norman Cosmetics v. Martin,* 705 F.Supp. 296, 299–300 (E.D.La.1988).

#### b. Potential removal and transfer

Boatmen's argues that KPERS' institution of a Kansas suit would result in an unnecessary expenditure of time and expense by the parties and the courts, all of which can be avoided if KPERS is restrained from filing a separate Kansas lawsuit. If KPERS is allowed to file a separate suit against Boatmen's in the Shawnee County, Kansas District Court, Boatmen's has indicated that it will seek to remove that case to the United States District Court for the District of Kansas. Following removal, Boatmen's has indicated that it would request the Kansas federal court to transfer the removed action to this Court, where it could be consolidated with this action for efficient disposition. However, the decision to transfer a case is discretionary and it is unclear whether a judge in the District of Kansas would find that a transfer is warranted. Therefore, it is merely speculative whether Boatmen's would succeed in its attempts at transfer and consolidation.

#### c. Convenience of the parties

An additional factor considered by the *Northwest* court was whether venue was proper in either of the courts. In this case, neither party will be prejudiced by proceeding with its claims in this federal court or in Kansas state court. To begin with, both courts have personal and subject matter jurisdiction over this controversy. In addition, the availability and convenience of the witnesses is roughly the same for either forum. If this action is litigated in Kansas state court, Boatmen's witnesses will have to travel

---

7. *See, Kansas Public Employees Retirement System v. Reimer & Koger Assoc., Inc.,* 61 F.3d 608 (8th Cir.1995).

a short distance—roughly 60 miles—to Tope-ka, Kansas, whereas if it is litigated in this federal court, KPERS' witnesses will have to travel a short distance to Kansas City, Missouri. Thus, the Shawnee County, Kansas District Court will be just as convenient for the parties as this forum.

### III. CONCLUSION

The Court is mindful of "[t]he spectre of duplicative efforts and costs ... together with the waste of judicial resources inherent in parallel litigation." *Northwest Airlines*, 989 F.2d at 1007. And at a later time, upon consideration of a motion to transfer, or consolidate, or dismiss, it may be appropriate to further consider "the relationship between the two lawsuits and the economies to be gained by pursuing them in a single forum." *Terra Intern., Inc. v. Mississippi Chemical Corp.*, 896 F.Supp. 1468, 1479 (N.D.Iowa 1995). However, at this time the Court is presented only with a motion for preliminary injunction, and compelling circumstances exist such as to warrant abrogation of the first-filed rule because Boatmen's suit was filed in anticipation of a lawsuit by KPERS and must be viewed as a preemptive strike.

### IV. RELIEF ORDERED

It is therefore ORDERED and DE-CREED that this Court has proper jurisdiction over this action. It is further

ORDERED that the foregoing findings of fact and conclusions of law are hereby adopted as the Order of this Court effective as of December 16, 1994. It is further

ORDERED that the Preliminary Injunction issued by this Court on December 16, 1994, prohibiting KPERS from filing any suit or claim against Boatmen's concerning KPERS' alleged Home Savings losses in any other court, is hereby DISSOLVED. It is further

ORDERED that the injunction bond filed with the Clerk of the Court by Boatmen's as a result of the Court's Preliminary Injunction Order is hereby DISSOLVED and Boatmen's and its surety are hereby DIS-

CHARGED from their obligations under said bond.